**Dennis BARKER, Plaintiff,**

v.

**INTERNATIONAL PAPER COMPANY, Defendant.**

No. 96–231–B.

United States District Court, D. Maine.

Jan. 22, 1998.

---

Jeffrey N. Young, McTeague, Higbee, Topsham, ME, for Plaintiff.

James R. Erwin, Pierce Atwood, Portland, ME, for Defendant.

## ORDER AND MEMORANDUM
## OF DECISION

BRODY, District Judge.

Plaintiff, Dennis Barker ("Barker"), brings this action against Defendant, International Paper Company ("IP"), for violation of the Americans with Disabilities Act ("ADA") (Counts I, IV), 42 U.S.C. §§ 12101 et seq., the Rehabilitation Act (Counts II, V), 29 U.S.C. § 701 et seq., the Maine Human Rights Act ("MHRA") (Counts III, VI), 5 M.R.S.A. § 4551 et seq., and for tortious interference with prospective advantageous economic relationship. Before the Court is Defendant's Motion for Summary Judgment on all of Plaintiff's claims. For the reasons set forth below, Defendant's motion is GRANTED in part, and DENIED in part.

### BACKGROUND

For the purposes of summary judgment, the Court views the facts in the light most favorable to the nonmoving party. *See McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995). From July 1987 to October 1994, Plaintiff worked for Defendant at its Androscoggin mill in Jay, Maine. Plaintiff started at IP as an hourly power plant trainee, and was promoted several times to other positions in the mill. In January 1993, Barker transferred laterally from the utilities area into construction and began reporting to Robert Michaud, manager of construction. Michaud reported directly to Rick Dorey, manager of plant engineering, who reported to Shawn Kilpatrick, manager of capital projects and plant engineering. In his performance evaluation for 1993, the last before his discharge, Plaintiff was classified as a "quality contributor,"[1] and in January 1994, he was promoted to department engineer.

Plaintiff's wife, Denise Barker, is an insulin-dependent diabetic with a diabetic retinopathy. Among other things, Denise Barker's condition limits her vision and mobility. This "impairment to her vision and mobility substantially limits Ms. Barker's ability to en-

gage in activities in areas which are not well lit, including in particular driving at night." Amended Compl. ¶ 11.

From July 1993 to November 1993, Denise Barker provided nursing services to the mill's Health Services Department under a contract with Defendant. Although originally hired to work days, in October 1993, during a plant shutdown, Defendant requested that Denise Barker work nights, something she could not safely do because of her limited vision and inability to drive at night. Plaintiff attempted to help his wife avoid this change to her schedule by speaking with her supervisor, Lois Feith, about her need for an accommodation. Feith changed Denise Barker's hours as requested, but Plaintiff's advocacy allegedly angered Feith who told Michaud that she would go to the mill manager to have Plaintiff fired if he continued advocating on behalf of his wife.

After the shutdown Defendant again requested that Denise Barker work night shifts. She refused, and in November 1993, Defendant terminated Denise Barker's contract. In April 1994, Denise Barker filed a charge of disability discrimination with the Maine Human Rights Commission ("MHRC"), based upon her termination by Defendant. On or about May 11, 1994, Defendant received notice of Denise Barker's allegations.

In midyear 1994, Plaintiff met with Kilpatrick to discuss a possible transfer to a position on the paper machine side of the mill, for the purposes of career advancement. Kilpatrick indicated that he would support Plaintiff's attempts to advance, and over the following few months, while continuing to work in construction, Plaintiff actively pursued a transfer. Plaintiff reiterated his desire to transfer out of construction in a meeting with Kilpatrick on or about September 29, 1994, at which he also allegedly discussed concerns he had about working with Michaud.

In spring 1994, around the same time Defendant received notice of Denise Barker's discrimination charge, Michaud evidently be-

---

[1] For this last performance evaluation, completed in early 1994, Michaud had recommended that IP classify Plaintiff as a "key contributor," the highest ranking possible. Plaintiff, however, was ultimately classified at the lower, but still satisfactory rating of "quality contributor."

gan having performance problems with Plaintiff. After meeting with David Osgood, the mill's human resource person for salaried personnel, Michaud drafted a memo dated September 30, 1994, documenting his alleged problems with Plaintiff and recommending that he be terminated. After receiving Michaud's termination memo, Kilpatrick met with Osgood and Michaud to discuss the recommended termination. According to Michaud's deposition testimony, the meeting "was a consensus type situation." Michaud Dep. at 83.

On October 10, 1994, Kilpatrick met with Michaud and Plaintiff, and Plaintiff's employment with IP was terminated effective at the end of the shutdown. At the meeting, Kilpatrick made statements indicating that he believed Plaintiff was refusing to work in construction after the shutdown. Plaintiff allegedly did not respond to these statements because he was "stunned by the termination," and at no point during the meeting affirmatively stated that he was "all done in construction," that he would no longer work for Michaud, or words to that effect. Plaintiff further alleges that he never made these or similar statements to Michaud or Osgood at any other time.

On October 27, 1994, Plaintiff attended an exit interview with Osgood. Prior to this meeting, Plaintiff provided Osgood with a memo in which he emphasized that it was Kilpatrick's position, not his position, that he was "all done in construction." At his exit interview, Plaintiff expressly stated that it was not his intention to quit his job. When Osgood asked him why he had not made this position clear earlier, Plaintiff told him it was because he "was completely caught off guard with the termination, and [ ] didn't know how to respond." Barker Dep. at 166. Osgood indicated, however, that it was "too late, it's over, and that there were no positions within the company or within the mill." *Id.* Osgood further told Plaintiff that he was "one of the best engineers that the company had had," but that he was "a difficult employee to manage." *Id.* at 166–67. When Plaintiff asked for examples of his poor interpersonal skills, Osgood suggested that "[the] per[fect] example is when your wife was in trouble

with the company." *Id.* at 167; Barker Dep. Ex. 12.

Following his termination, Plaintiff filed a charge of employment discrimination against Defendant with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Maine Human Rights Commission ("MHRC"). Plaintiff received a statement of findings from the MHRC dated August 14, 1994, and a right-to-sue letter from the EEOC dated October 10, 1996.

In 1995, Plaintiff sought employment with the Willamette Paper Company in Johnsonburg, Pennsylvania. Willamette flew Plaintiff to Pennsylvania to visit the mill twice, once by himself, and then with his family. On the second trip, Plaintiff alleges that William Keswick, Willamette's engineering manager, told him that Willamette would be making him an offer the following Wednesday. When Keswick did not contact Plaintiff on that day, Plaintiff called Keswick. Keswick initially informed Plaintiff that Willamette would not be making him an offer of employment because he was seeking a salary that was a few thousand dollars more than what Willamette was willing to offer. When Plaintiff asked Keswick what was "really happening," however, Keswick responded that Jim Watson, Willamette's mill manager, had called someone at IP, and that "based upon that conversation they decided not to make the offer." Barker Dep. at 212. Keswick subsequently indicated that he had no recollection of this conversation with Plaintiff or Watson's comments about the alleged phone reference.

## SUMMARY JUDGMENT

Summary judgment is appropriate in the absence of a genuine issue of any material fact and when the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An issue is genuine for summary judgment purposes, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one that has "the potential to affect the outcome of the suit under applicable law." *Nereida–Gonzalez v. Tirado–Delgado,* 990

F.2d 701, 703 (1st Cir.1993). Facts may be drawn from "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." Fed. R.Civ.P. 56(c).

**DISCUSSION**

Plaintiff contends that: (1) IP unlawfully terminated his employment because of his association with his wife in violation of the ADA, Rehabilitation Act, and MHRA (Counts I–III); (2) IP unlawfully terminated his employment in retaliation for his advocacy on behalf of his wife in violation of the ADA, Rehabilitation Act, and MHRA (Counts IV–VI); and (3) IP tortiously interfered with his attempt to find employment with the Willamette Paper Company (Count VII). While Plaintiff's first two claims allege violations of three separate statutes, the analysis of each claim is the same under each statute. *See Soileau v. Guilford of Maine, Inc.,* 105 F.3d 12, 14 (1st Cir.1997) (citing *Winston v. Maine Technical College Sys.,* 631 A.2d 70, 74 (Me.1993)) ("[I]nterpretation of the ADA and of the Maine Human Rights Act have proceeded hand in hand...."); 29 U.S.C. § 794(d) ("The standards used to determine whether this section [ § 504 of the Rehabilitation Act] has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990....") Therefore, the Court will analyze Plaintiff's first two contentions under the ADA.

A. Association

Pursuant to 42 U.S.C. § 12112(b)(4), an employer may not:

> exclud[e] or otherwise den[y] equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association.

■ In a case such as this, where Plaintiff has not presented direct evidence of discrimination, the Court will apply the burden shifting analysis established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Jacques v. Clean–Up Group, Inc.,* 96 F.3d 506, 511 (1st Cir.1996). Plaintiff bears the initial burden of establishing a prima facie case of discrimination by proving that: (1) he was "qualified" for the position; (2) he was subjected to an adverse employment action; (3) he was known by his employer at the time to have a relative or associate with a disability; and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision. *See Hartog v. Wasatch Academy,* 129 F.3d 1076, 1084 (10th Cir.1997); *see also Lester v. Compass Bank,* No. 96–AR–0812–S, 1997 WL 151782, at *3 (N.D.Ala. Feb.10, 1997). Once Plaintiff establishes a prima facie case of discrimination, "the burden of production shifts to the defendant but requires, only, that the defendant articulate a legitimate, nondiscriminatory reason for its action." *See Hodgens v. General Dynamics Corp.,* 963 F.Supp. 102, 106 (D.R.I.1997) (citing *McDonnell Douglas,* 411 U.S. at 802–806). If Defendant proffers such a reason, the burden shifts back to Plaintiff to establish that Defendant's reason is merely a pretext for discrimination. *Id.*

■ Plaintiff alleges in Counts I–III that Defendant discriminated against him because of his association with his wife, an individual with a disability. Defendant contends that it is entitled to summary judgment on these Counts because Plaintiff has failed to establish a prima facie case of association discrimination. The Court agrees.

The parties have stipulated that Denise Barker is disabled within the meaning of the ADA and the MHRA, and Defendant does not dispute that Plaintiff was subjected to an adverse employment action. Plaintiff has also generated a question of material fact as to whether the responsible decision makers at IP knew of Denise Barker's disability, and whether Plaintiff was qualified for his position. With respect to the responsible decision makers' knowledge, Plaintiff rebuts Defendant's claim that Kilpatrick was the only person responsible for the decision to fire Plaintiff with evidence that Kilpatrick, Michaud, and Osgood met in a "consensus type situation" prior to the October 10, 1994, ter-

mination meeting to discuss Michaud's recommendation to terminate Plaintiff. While Kilpatrick may not have known about Denise Barker's disability, the record indicates that Michaud was aware of her disability and of Plaintiff's advocacy on her behalf. Moreover, although Osgood denies knowledge of Denise Barker's disability, the Court is persuaded that a reasonable factfinder could question the credibility of this denial, given that Osgood mentioned Denise Barker's "trouble with the company" at Plaintiff's exit interview.

With respect to Defendant's contention that Plaintiff was unqualified for his position because he was refusing to do his job in construction, Plaintiff asserts that he did not respond to Kilpatrick's statements about his refusal to work in construction at the October 10, 1994, meeting because he was "stunned by the termination." Plaintiff also alleges that he never told Michaud or Osgood at any other time that he was "all done in construction," or words to that effect, and expressly stated at his exit interview that it was not his intention to quit. The Court is persuaded that a genuine issue of fact exists with respect to Plaintiff's qualifications.[2]

Plaintiff's prima facie case of association discrimination fails, however, because Plaintiff has failed to demonstrate a causal connection between his termination and his association with his wife. According to the interpretive guidelines, the purpose of 42 U.S.C. § 12112(b)(4) is to prevent "unfounded stereotypes and assumptions against employees who associate with disabled people." *Den Hartog v. Wasatch Academy*, 909 F.Supp. 1393, 1400 (D.Utah 1995), *aff'd*, 129 F.3d 1076, 1997 WL 688386 (10th Cir.1997). The guidelines suggest that the provision was intended to prevent, for example, an employer from making an adverse employment decision based on the "belie[f] that the [employee] would have to miss work or frequently leave work early in order to care for" a disabled associate, or because the "employ-

ee does volunteer work with people who have AIDS, and the employer fears that the employee may contract the disease." 29 C.F.R. § 1630, App. at 360 (1997); *see also, Braverman v. Penobscot Shoe Co.*, 859 F.Supp. 596, 604 (D.Me.1994); *Lester*, 1997 WL 151782, at *3.

Plaintiff's contentions do not fit within this framework. Plaintiff has not alleged that Defendant held or acted upon any unfounded assumptions about Plaintiff on account of his wife's disability. Rather, Plaintiff alleges that he was terminated because of his advocacy on behalf of his wife, and his wife's subsequent filing of a discrimination charge with the MHRC. As discussed in the next section, under these circumstances Plaintiff may be protected by the ADA's prohibition against retaliation or coercion, pursuant to 42 U.S.C. § 12203(a)–(c). Plaintiff's allegations, however, do not fall within the scope of the ADA association discrimination provision. *See Lester*, 1997 WL 151782, at *3 (individual who "champions the cause of a disabled individual in the exercise of the disabled's rights protected by the ADA" is protected by 42 U.S.C. § 12203(a)–(c) not 42 U.S.C. § 12112(b)(4)). The Court, therefore, grants Defendant's Motion for Summary Judgment on Counts I–III.

## B. Retaliation

In Counts IV–VI, Plaintiff alleges that Defendant unlawfully terminated him because of his advocacy on behalf of his wife. The ADA provides:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual .... on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by [the ADA].

42 U.S.C. § 12203(b).

In order to establish a prima facie case of employment retaliation, Plaintiff must show that: (1) he aided his wife in an ADA-

---

**2.** The Court agrees with Plaintiff that the cases cited by Defendant in support of its argument that Barker was unqualified are inapposite, because they involved employees with attendance problems and Defendant has not raised similar allegations in this case. *See Tyndall v. Nat'l Educ. Centers, Inc.*, 31 F.3d 209, 213 (4th Cir. 1994); *Jackson v. Veterans Admin.*, 22 F.3d 277, 279 (11th Cir.1994); *Wimbley v. Bolger*, 642 F.Supp. 481, 485 (W.D.Tenn.1986).

protected activity; (2) he was subjected to an adverse employment activity; and (3) there exists a causal link between the protected activity and the employment decision. *Braverman*, 859 F.Supp. at 604; *see also, Soileau*, 105 F.3d at 16 (explaining elements of a retaliation charge under 42 U.S.C. § 12203(a)). Defendant argues that Plaintiff cannot establish a prima facie case of retaliation discrimination. The Court, however, is persuaded that Plaintiff has raised sufficient facts to support his claim at this stage of the proceedings. *See Lipsett v. University of Puerto Rico*, 864 F.2d 881, 899 (1st Cir.1988) (plaintiff's initial burden in establishing a prima facie case of retaliation is not onerous).

As discussed above, Defendant does not dispute the occurrence of an adverse employment activity. Plaintiff has also generated an issue of material fact about whether he was aiding his wife in an ADA protected activity when he went to Lois Feith and requested a change in his wife's work schedule. Although Defendant contends that Plaintiff did so solely so that he and his wife could deal with "life's ordinary responsibilities—here, childcare and transportation to and from work," Plaintiff alleges that he went to Feith to explain why his wife's lack of night vision impaired her ability to work at night, and to request that her schedule be changed to accommodate this problem. The record indicates that at the time Defendant hired Denise Barker, she advised Feith of her disability and her lack of night vision. Since requesting an accommodation for a disability constitutes a protected activity under the ADA, Plaintiff easily satisfies his burden on this element.

The Court is further persuaded that sufficient issues of material fact exist with respect to the causal link between Plaintiff's advocacy on behalf of his wife and his termination. As mentioned above, Osgood made reference to Plaintiff's handling of his wife's problems with IP as an example of his poor interpersonal skills. Osgood denies that he knew of Denise's disability, but his credibility is an issue that should be determined at trial. This Court has also previously found that in that in the absence of any direct evidence of a causal link, "courts rely on the concept of temporal proximity to establish causation." *Soileau v. Guilford of Maine*, 928 F.Supp. 37, 53 (D.Me.1996), *aff'd*, 105 F.3d 12 (1st Cir.1997). Defendant's problems with, and subsequent decision to terminate Plaintiff occurred in the spring of 1994, around the same time that IP received notice of Denise Barker's discrimination claim. While Plaintiff has not presented direct evidence that the potentially responsible decision makers knew of Denise Barker's notice, the temporal proximity of the events raises another inference that Plaintiff's termination might have been connected with his wife's disability and Plaintiff's advocacy on her behalf. The Court finds, therefore, that Plaintiff has presented sufficient evidence to create a question of material fact on his retaliation claim, and denies Defendant's Motion for Summary Judgment on Counts IV–VI.

**C. Tortious Interference with Prospective Advantageous Economic Relationship**

In Count VII, Plaintiff alleges that Defendant tortiously interfered with a prospective advantageous economic relationship. Specifically, Plaintiff alleges that he was rejected for a position with the Willamette Paper Company on account of a negative job reference provided over the phone by an employee of IP to Jim Watson, the Willamette mill manager. Plaintiff claims that Keswick told him that Willamette made the decision not to hire him based upon this phone call.

In order to establish a claim for tortious interference with prospective advantageous economic relationship, Plaintiff must prove that Defendant "by fraud or intimidation" interfered with Plaintiff's future economic expectancy. *See June Roberts Agency, Inc. v. Venture Properties, Inc.*, 676 A.2d 46, 50 (Me.1996); Donald N. Zillman, Jack H. Simmons, and David D. Gregory, *Maine Tort Law* § 11.09, at 11–17 (1995) ("The [Maine Supreme Judicial] Court has recognized that a tort action also may be maintained for interference with a future economic expectancy even if it has not yet been reduced to present contract."). The Court is persuaded that summary judgment at this stage of the proceedings is inappropriate on the issue of Defendant's tortious interference.

Defendant first contends that the alleged statements made by Keswick to Plaintiff are inadmissible hearsay. Indeed, Keswick has no memory of any such conversation with Plaintiff. The Court determines, however, that the admissibility of this evidence under Federal Rule of Evidence 804(b)(3), as Plaintiff suggests, or any other hearsay exception is more appropriately decided at trial. Viewing the facts in the light most favorable to Plaintiff, the Court is satisfied that the alleged phone call from an employee at IP to Watson may have involved false information about Plaintiff, thereby satisfying the requirement that Defendant act fraudulently.

Defendant's second contention is that Plaintiff would not have received an offer of employment from Willamette irrespective of the allegedly negative phone reference, since Willamette based its decision not to hire Plaintiff solely on Plaintiff's own attitude towards IP. In light of Plaintiff's contention that Keswick expressly told him that the decision not to hire him was based upon the phone reference, however, the Court is persuaded that Plaintiff has raised a question of material fact as to the reason behind Willamette's decision not to hire Plaintiff. The Court denies Defendant's Motion for Summary Judgment on Count VII.

## CONCLUSION

For the reasons stated above, the Court GRANTS Defendant's Motion for Summary Judgment on Counts I, II, and III. The Court DENIES Defendant's Motion on Counts IV, V, VI, and VII.

*SO ORDERED.*